UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| CARROLLTON HOSPITALITY, LLC, et. al. | ) ) ) | |
| Plaintiffs, | ) ) | Civil No.: 13-21-GFVT |
| V. | ) ) | **MEMORANDUM OPINION** |
| KENTUCKY INSIGHT PARTNERS II, LP, | ) ) ) | **&** **ORDER** |
| Defendant. | ) ) | |

*** *** *** ***

This case involves questions of which party is obligated to pay a debt for cable television services in a situation involving several different contracts with different entities. The Plaintiffs maintain they are not liable for the debt owed to the Defendant for unpaid cable bills, and the Defendant has filed a counterclaim contending that Plaintiffs must pay the debt. Defendant now requests summary judgment in its favor on all of Plaintiffs' claims and also on its counterclaims against the Plaintiffs. [R. 31.] Plaintiffs in turn request partial summary judgment in their favor on Count I of Defendant's counterclaims. [R. 32.] For the reasons explained below, the Defendant's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART, and the Plaintiffs' Motion for Partial Summary Judgment is DENIED.

# I

The Plaintiffs in this case all own or operate hotels located in Carrollton, Kentucky. Plaintiff Carrollton Hospitality, LLC ("Hospitality") owns the Carrollton Best Western Hotel; Plaintiff Carrollton Host Enterprises, LLC ("Host") owns the Carrollton Hampton Inn; Plaintiff

Holiday Host, LLC ("Holiday") owns the Carrollton Holiday Inn Express; and Plaintiff Lloyd Abdoo is the managing member of each of these organizations. [R. 1-2 at ¶¶ 1-2.] All the Plaintiffs are citizens of Kentucky. [*Id*.] The Defendant, Insight Kentucky Partners II, LP ("Insight"), is a citizen of Delaware and provides telecommunications services to Plaintiffs as well as other entities. [*Id*. at ¶ 3.] This Court has diversity jurisdiction over this matter, pursuant to 28 U.S.C. §1332.

## A

Before the events giving rise to this litigation took place, the owner of the Carrollton Best Western hotel was Best Host, LLC, who contracted with SAI Hospitality, LLC ("SAI") to operate the hotel. [R. 31-5 at 16.] In July 2001, SAI entered into a contract with Insight called the SAI Standard Hotel Agreement. [R. 31-13.] Pursuant to that agreement, Insight contracted to provide cable television services in exchange for monthly payments and necessary installation costs. [*Id*.] The contract was to remain in effect for a three-year term with subsequent automatic renewals for periods of one year unless either party notified the other party in writing otherwise. [*Id*. at §4.] The SAI Agreement also stated that it would be "binding upon and inure to the benefit of the parties hereto and their respective successors and assigns," and the hotel owner agreed to give notice of this agreement to any prospective purchasers of the hotel. [*Id*. at §12(b).] SAI Hospitality was administratively dissolved in November 2002, well before the expiration of its contract with Insight [R. 32-13], and Best Host eventually sold the Best Western hotel to NC Capital. [R. 31-5 at 15.] Despite these changes in management, Insight continued to provide services under the SAI agreement, and continued to receive monthly payments for those services. [R. 31-8 at ¶5; R. 36 at 11.]

Plaintiff Hospitality was formed as an LLC in July 2007, and in November 2007, Hospitality purchased the Carrollton Best Western hotel from NC Capital. [R. 1-2 at ¶ 4; R. 32-7 at 14.] As before, Insight continued to provide services and continued to receive payment for those services, pursuant to the automatic yearly renewals of the SAI Agreement. [R. 31-8 at ¶5; R. 36 at 11.] In May 2009, Hospitality entered into an agreement with Prewitt Holdings, LLC and Kelly Prewitt ("Prewitt") to manage and operate the Best Western Hotel for Hospitality with an option to purchase the hotel within a certain period of time. [R. 31-14.] Between May 2009, and January 2011, Prewitt operated the hotel on behalf of Hospitality, and during that time, Insight continued to bill for its services to the Best Western Hotel, and payments were made to Insight for those services. [R. 31-9.] Also during that time period, Prewitt defaulted on several payments to Insight, and by January 26, 2011, owed Insight a balance of $9,566.71 for unpaid cable services. [R. 32-10 at 7.]

On January 28, 2011, Hospitality resumed management of the Best Western hotel from Prewitt and informed Insight of this development. [R. 32-9; R. 31-16.] Lloyd Abdoo, on behalf of Hospitality, acknowledged that Prewitt owed an outstanding debt to Insight, and asked Insight to review the past due bills along with company documents in order to "come to a fair and equitable settlement" of the amounts owed. [R. 31-16.] Shortly afterward a dispute apparently ensued concerning whether Hospitality was obligated to pay the debt owed by Prewitt. [R. 36 at 4-5.] Insight requested documentation establishing that Hospitality did not own the Best Western hotel during the time period that Prewitt managed the hotel, but the documents Hospitality submitted in response do not establish that it did not own the hotel during the period

in question.[1]  [R. 36 at 5; R. 31-17.]  Even now, Hospitality does not dispute that it owned the hotel during that time period.  [R. 31-5 at 24-25.]

On March 10, 2011, Hospitality entered into a new seven-year exclusive contract with Insight for cable television services in exchange for a monthly fee to be paid in advance.  [R. 31-4.]  This agreement is referred to as the "CHL Standard Hotel Agreement."  [R. 31-1 at 4.]  The circumstances under which that agreement was entered into comprise one of the primary disputes at issue in this litigation.  Hospitality claims that Insight's sales representative Chad Reynolds verbally promised Mr. Abdoo that Insight would not attempt to collect the unpaid balance on the Prewitt account if Mr. Abdoo would cause Hospitality, Host, and Holiday to each enter into a seven-year contract with Insight for cable television services, and that this promise not to collect Prewitt's delinquencies from Hospitality was the "material inducement" to enter into the contracts.  [R. 1-2 at ¶¶ 12-13.]  Insight, however, denies the existence of any such verbal agreement.

The existence of the 2011 contract between Insight and Hospitality, however is undisputed.  That contract gave Insight the exclusive right to provide television programming services to the three hotels for the term of the agreement, and was to be effective for seven years with automatic renewal for one-year periods unless otherwise terminated.  [R. 31-4.]  Termination before the end of the seven-year term would only occur "by either party on thirty (30) days prior written notice in the event of a material breach of this Agreement. . . ."  [*Id.*] The parties also do not dispute that Abdoo as managing member of Hospitality, Host, and Holiday, reviewed the agreement and told Hospitality's Director of Operations, Melissa Petty, to sign it.  [R. 31-5 at 31-32.]  On the same day, Melissa Petty also signed the same agreement with Insight

---

[1] In the matter before the Court, Hospitality does not dispute ownership of the hotel, but contends that despite its ownership, it should not be held responsible for the debt owed by Prewitt.  Hospitality also does not dispute that the documents it submitted to Insight are the ones attached to Insight's motion at R. 31-17.

for Host and Holiday, also at Abdoo's direction. [*Id.*] Collectively, these contracts are referred to as the "2011 Service Agreements."

Insight alleges, and Hospitality does not dispute, that soon after these new contracts were signed, Hospitality fell behind on payments to Insight for services to the Best Western hotel. [R. 31-1 at ¶¶ 17-19; R. 31-10.] By September, 2011, Hospitality owed a balance on its account with Insight of $15, 308.70, not including the amount owed by Prewitt. [R. 31-9.] Insight attempted to contact Hospitality about the unpaid balance in September 2011, and in February 2012, but did not receive any response.[2] [R. 31-1 at ¶¶19-20; R. 31-8; R. 31-10.] In September 2012, Hospitality paid part of the outstanding charges, but not the amount owed on the Prewitt account. [R. 31-1 at ¶ 22; R. 31-9.] On or about October 8, 2012,[3] Insight employee Erin Durham informed Melissa Petty by phone that Insight would discontinue its services by October 15, 2012, if the outstanding balance owed to Insight was not paid. [R. 31-8 at ¶ 20.] Two days after this conversation Hospitality entered into a separate contract with a different internet and cable provider, MDU Enterprises, Inc., to provide television services to the Best Western hotel for seven years. [R. 31-12.] Hospitality also filed a complaint in Carroll Circuit Court on October 12, 2012, and obtained a restraining order prohibiting Insight from discontinuing its cable, internet and telephone service at the Best Western Hotel. [R. 1-1; R. 1-6.] Insight alleges, and Hospitality does not dispute, that Hospitality has not made any payments due to Insight since October 23, 2012, although Insight has had to continue providing services because of the restraining order. [R. 31-8; R. 31-9.]

---

[2] Hospitality has not disputed these allegations or submitted any evidence disproving them, and Insight has submitted documentation establishing the attempt to contact Hospitality in February, 2012.

[3] The Amended Complaint alleges this conversation took place on October 11, 2012. [R. 1-2 at ¶ 18.] Insight's motions and responses all say "on or about October 8, 2012," and Plaintiffs do not dispute the date. Insight employee Erin Durham's Declaration references October 8, 2012, which is why the Court references that date. [R. 31-8 at ¶ 20.]

**B**

Hospitality filed an amended complaint in Carroll Circuit Court in 2013 adding Host, Holiday, and Abdoo as named plaintiffs and alleging claims against Insight for breach of contract, anticipatory breach of contract, fraud, and breach of the implied covenant of good faith and fair dealing.  [R. 1-2.]  Insight then removed this case to federal court in April, 2013, invoking this Court's diversity jurisdiction.  [R. 1.]  Plaintiffs moved to remand the case to state court, but the Court denied the motion to remand and held that the requirements for diversity jurisdiction under 28 U.S.C. §1332(a)(1) had been met.  [R. 26.]

In May 2013, Insight filed an amended answer and counterclaim, alleging that Hospitality had breached its contract with Insight and seeking a declaratory judgment against Hospitality, Host, and Holiday declaring that the 2011 Service Agreements with each of those entities are valid and enforceable.  [R. 5.]  Insight then moved for summary judgment against Plaintiffs on each of the Plaintiffs' claims and for judgment in its favor on each of Insight's counterclaims.  [R. 31.]  The Plaintiffs then moved for partial summary judgment in their favor on Counts I, III, and IV of Insight's counterclaims.  [R. 32.]  Since that time, the parties have agreed to dismiss without prejudice Counts III and IV of Insight's counterclaim, which alleged breach of contract against Plaintiffs Host and Holiday.  [R. 35.]  The summary judgment motions on the remaining claims and counterclaims have been fully briefed and are now ripe for adjudication.

Accordingly, the claims presently before the Court are as follows:  The Plaintiffs' claims against Insight are for 1) breach of contract with Hospitality; 2) anticipatory breach of contract with Hospitality; 3) fraud; and 4) breach of the implied covenant of good faith and fair dealing. Insight's remaining counterclaims are: 1) that Hospitality breached the SAI Standard Hotel Agreement because Hospitality succeeded to that contract and Prewitt breached the contract by

failing to make required payments to Insight while acting as Hospitality's agent; 2) that

Hospitality breached the 2011 Service Agreement between Insight and Hospitality by carrying an

unpaid balance for more than thirty days and by contracting with another service provider; and 3)

Insight requests a declaratory judgment that the 2011 Service Agreements with Hospitality, Host,

and Holiday are all valid and enforceable.  Insight requests summary judgment in its favor on all

of these claims and counterclaims, and also requests attorneys' fees and costs pursuant to the

terms of the SAI Standard Hotel Agreement and the 2011 Service Agreements.  Plaintiffs request

partial summary judgment in their favor on Insight's counterclaim alleging Hospitality's breach

of the 2001 SAI Standard Agreement.

## III

### A

As stated above, this action is in federal court on the basis of diversity jurisdiction,

pursuant to 28 U.S.C. § 1332.  Because Kentucky is the forum state, its substantive law will be

used.  *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 526 (6th Cir. 2006) (citations omitted).

However, federal procedural law will govern as applicable, including in establishing the

appropriate summary judgment standard.  *Weaver v. Caldwell Tanks, Inc.*, 190 F. App'x 404,

408 (6th Cir. 2006).

Summary judgment is appropriate when "the pleadings, discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex

Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986).  "A genuine dispute exists on a material fact, and

thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a

verdict for the nonmoving party.'"  *Olinger v. Corp. of the President of the Church*, 521 F. Supp.

2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Stated otherwise, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325. Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate there is a genuine issue. *Hall Holding*, 285 F.3d at 424 (citing *Celotex Corp.*, 477 U.S. at 324). In applying the summary judgment standard, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001) (citing *Anderson*, 477 U.S. at 255). Yet even when construing the evidence in the light most favorable to the non-moving party, the non-moving party still "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushitu Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Rather, the Federal Rules of Civil Procedure require the non-moving party to present "specific facts showing that there is a genuine issue for trial." *Id*. (citing Fed. R. Civ. P. 56(e)).

**B**

"It is well settled that the interpretation of contracts is an issue of law for the court to decide." *Equitania Ins. Co. v. Slone & Garrett, P.S.C.,* 191 S.W.3d 552, 556 (Ky. 2006). To establish a claim for breach of contract, Kentucky common law requires the plaintiff to establish:

"1) existence of a contract; 2) breach of that contract; and 3) damages flowing from the breach of contract." *Fifth Third Bank v. Lincoln Fin. Sec. Corp*., 453 F. Appx. 589, 601 (6th Cir. 2011) (quoting *Metro Louisville/Jefferson Cnty. Gov't v. Abma,* 326 S.W.3d 1, 8 (Ky. Ct. App. 2009). Thus, a plaintiff seeking to recover for breach of contract must first establish "by clear and convincing evidence that an agreement existed between the parties." *MidAmerican Distribution, Inc. v. Clarification Tech., Inc.*, 807 F. Supp. 2d 646, 666-67 (E.D. Ky. 2011) *aff'd*, 485 F. App'x 779 (6th Cir. 2012) (internal quotation omitted).

While "an oral contract is ordinarily no less binding than one reduced to writing," where the parties execute a written instrument, an unambiguous written contract "will be enforced strictly according to its terms," and the court will interpret those terms "by assigning language its ordinary meaning and without resort to extrinsic evidence." *Frear v. P.T.A. Indus., Inc*., 103 S.W. 3d 99, 105-06 (Ky. 2003) (internal quotations omitted). Thus, in the absence of ambiguity, the terms in a written contract cannot be varied by parol evidence, which "consists of evidence of agreements between or the behavior of the parties prior to or contemporaneous with the contract," including "'evidence of a contemporaneous oral agreement on the same subject matter, verifying, modifying, contradicting, or enlarging a contract.'" *Luttrell v. Cooper Indus*., 60 F.Supp. 2d 629, 631 (E.D. Ky. 1998) (quoting *M.R. Kopmeyer Co. v. Barnes*, 276 S.W. 2d 21, 23-24 (Ky. 1955)). The unambiguous, written agreement "is presumed to be final and complete, with all prior negotiations abandoned or incorporated into the final document." *Grass v. Akins*, 368 S.W. 3d 150, 153 (Ky. Ct. App. 2012) (citations omitted). Consequently, "when parties reduce their agreement to a clear, unambiguous, and duly executed writing, all prior negotiations, understandings, and agreements merge into the [written] instrument," which "cannot be modified

or changed by prior parol evidence, except in certain circumstances such as fraud or mistake." *New Life Cleaners v. Tuttle,* 292 S.W.3d 318, 322 (Ky. Ct. App. 2009).

An exception to the prohibition on introducing parol evidence exists in situations of fraud. To prevail on a claim for fraud under Kentucky law, the plaintiff must establish "by clear and convincing evidence" each of the following elements: "(1) that the declarant made a material representation to the plaintiff, (2) that this representation was false, (3) that the declarant knew the representation was false or made it recklessly, (4) that the declarant induced the plaintiff to act upon the misrepresentation, (5) that the plaintiff relied upon the misrepresentation, and (6) that the misrepresentation caused injury to the plaintiff." *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009) (citing *United Parcel Serv. Co., v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999)). Because of the higher burden of proof required for fraud claims, evidence to overcome summary judgment must also meet this higher standard. *Liberty Lobby,* 477 U.S. at 253.

## C

### 1

Count I of the Plaintiffs' amended complaint alleges that Insight breached a verbal executory contract based on the alleged representations of Insight employee Chad Reynolds. [R. 1-2 at ¶ 22.] Plaintiffs claim that Reynolds orally promised Abdoo that Insight would not attempt to collect Prewitt's unpaid balance from Hospitality in exchange for Abdoo ensuring that Hospitality, Host, and Holiday each signed a seven-year exclusive services contract with Insight. [*Id.* at ¶¶ 22-23.] Plaintiffs claim that Insight's attempts in 2012 to collect the debt owed by Prewitt were in breach of that oral contract. [*Id.* at ¶ 24.]

As explained above, while verbal contracts are generally valid, the problem for the Plaintiffs in this case is that extrinsic evidence, such as parol evidence, of prior verbal agreements is inadmissible to alter the terms of an unambiguous written contract. *Luttrell v. Cooper Indus.*, 60 F. Supp. 2d 629, 631 (E.D. Ky. 1998) (citing *M.R. Kopmeyer Co. v. Barnes*, 276 S.W. 2d 21, 23-24 (Ky. 1955)); *see also New Life Cleaners v. Tuttle,* 292 S.W. 3d 318, 322 (Ky. Ct. App. 2009). Regardless of whether or not Reynolds made a verbal promise on behalf of Insight, Hospitality and Insight subsequently entered into a written contract that does not appear to be ambiguous and which also contains a merger clause extinguishing all other previous, related verbal agreements. The Plaintiffs do not point to any term in the 2011 Service Agreements that is ambiguous such that parol evidence of previous understandings would be admissible.[4] "[A]n otherwise unambiguous contract does not become ambiguous when a party asserts—especially post hoc, and after detrimental reliance by another party—that the terms of the agreement fail to state what it intended." *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 107 (Ky. 2003). Thus, Plaintiffs are barred from introducing parol evidence of the alleged verbal agreement between Abdoo and Reynolds.

Even apart from the parol evidence rule, the 2011 Service Agreement also contains a merger and integration clause that expressly states it is "intended as a complete statement of all the terms and arrangements among the parties," and "supersedes any previous agreements. . . and understandings." [R. 31-4 at ¶12(0).] That statement alone should have alerted Mr. Abdoo

---

[4] Plaintiffs' only possible attempt to point to an ambiguity is their suggestion that perhaps the Court will find the merger clause to be ambiguous because it does not address the debt owed by Prewitt prior to the 2011 Service Agreement. [R. 34 at 16.] While the absence of a reference to prior agreements concerning the Prewitt debt perhaps would have served to alert Mr. Abdoo to a possible ambiguity in the contract, the Court cannot consider that omission an ambiguity because of the inadmissibility of parol evidence in this situation. "Contract language is not ambiguous unless it is subject to two reasonable interpretations. *Luttrell v. Cooper Indus., Inc.*, 60 F.Supp.2d 629, 631 (E.D. Ky. 1998). There is no ambiguity in the merger clause that is "patent and apparent on [its] face," such that parol evidence could be introduced, and the "court will not create an ambiguity where none exists." *See id.*

to the fact that any understanding from previous conversations with Reynolds would need to be included in this written contract in order to be effective.

In an attempt to avoid the consequences of the parol evidence rule, Plaintiffs also argue that the alleged agreement with Reynolds is admissible as a collateral contract, or in the alternative, that it is evidence of a fraudulent misrepresentation which would be admissible as an exception to the parol evidence rule. [R. 34 at 15.] A collateral contract can be an exception to the parol evidence rule only if "it is a thing apart from the one represented by the writing," and an agreement that is completely independent of the written contract. *Tex. Gas Transmission Corp. v. Kinslow*, 461 S.W.2d 69, 71 (Ky. 1970). Plaintiffs, however, contest that the alleged oral agreement was the inducement, and indeed the consideration, for them to agree to the 2011 Service Contracts – an allegation which, if true, would meant that the alleged oral agreement cannot simultaneously be collateral to the 2011 Service Contracts. Moreover, as explained below, Plaintiffs cannot establish their fraud claim, and therefore the alleged conversation with Reynolds is also not admissible as evidence of fraud.

Finally, even if evidence of the alleged verbal agreement were admissible, Plaintiffs have only offered unsubstantiated assertions concerning the existence of the agreement. Because Plaintiffs offer no evidence to support the existence of a verbal contract,[5] or the existence of an ambiguity in the written contract, the parol evidence rule applies. Thus, Plaintiffs' claim for breach fails on the first element – they cannot establish the existence of the alleged verbal contract. *See Metro Louisville/Jefferson Cnty. Gov't,* 326 S.W.3d at 8. Without that element,

---

[5] Abdoo even admits that he is unaware of any written documents reflecting the alleged oral agreement with Chad Reynolds concerning Insight allegedly promising to forego collection of the debt incurred before January 28, 2011. [R. 31-5 at 38, 40.]

Insight cannot be said to have breached the contract, and the Court must grant Insight summary judgment as to Count I of the Plaintiffs' amended complaint.[6]

**2**

Count II of the Plaintiffs' amended complaint alleges that Insight committed anticipatory breach of the 2011 Service Agreement by threatening to suspend services if the balance of the Prewitt account was not paid. [R. 1-2 at ¶¶ 18, 26.] Insight argues that it is entitled to summary judgment on this claim because Hospitality was the party who first materially breached the contract by carrying a past-due balance for more than thirty days, thus entitling Insight to suspend services pursuant to the contract. [R. 31-1 at 18 (citing CHL Standard Hotel Agreement, R. 31-4 at ¶ 3(b)).] In response, Hospitality contends that they did not owe the debt incurred by Prewitt because Hospitality never assumed the SAI Agreement; and that even if they did assume the SAI Agreement, any prior debt was merged into and extinguished by the 2011 Service Agreement, which Insight breached by threatening to suspend services. [R. 34 at 3, 16-17.]

Hospitality's arguments as to why it is not obligated to pay the debt incurred by Prewitt prior to 2011 are integrally related to Insight's first counterclaim, and will be more fully addressed in a later section when the Court discusses the counterclaims at issue. In that section, the Court will explain why Hospitality can be held liable for the unpaid balance incurred while Prewitt managed the hotel, but for now, it is sufficient to note that Insight was within its rights to suspend its services to Hospitality under the 2011 Agreement even if Hospitality had no obligation to pay any debt incurred before 2011.

---

[6] The Court notes that Plaintiffs' claim would also fail on the element of damages. With regard to both Counts I and II of the Amended Complaint, the Plaintiffs have not established that they suffered any recoverable damages from Insight's alleged breach or anticipatory breach, and thus cannot prevail on a claim for breach of contract.

The 2011 Service Agreement clearly states that if "any invoice remains outstanding for greater than thirty (30) days. . . Insight reserves the right to (i) charge interest on such outstanding balance. . ., (ii) suspend Owner's Service, or (iii) terminate this Agreement." [R. 31-4 at ¶ 3(b).] Insight's ledger account shows that by October, 2012, Hospitality had an outstanding balance on its account with Insight under the 2011 Service Agreement that was not solely due to the amount owed during the time Prewitt managed the hotel. [*See* R. 31-9 at 7-14; R. 31-11.] Hospitality does not dispute Insight's assertion that by repeatedly missing payments to Insight after signing the 2011 Service Agreements, the unpaid balance on Hospitality's account increased nearly $10,000 *after* Hospitality resumed management of the hotel and apart from any payments missed by Prewitt. [*See* R. 39 at 6; R. 31-9 at 4-17; R. 31-11.] Thus, regardless of which amount of debt was actually referenced in the phone call, Insight would have had the contractual right to suspend services without any warning at all because of the outstanding balance that Hospitality clearly carried for more than thirty days in direct breach of the 2011 Service Agreement.[7]

Moreover, Insight asserts, and Plaintiffs do not dispute, that Insight employee Erin Durham had repeatedly requested documents from Hospitality showing that Hospitality was not responsible for the Prewitt debt, yet Hospitality never submitted such documents. [R. 31-8 at ¶¶16-20.] The documents submitted to Insight that have been filed with the Court do not by themselves establish that Hospitality was not obligated to pay for services during the time Prewitt managed the hotel.[8] [*See* R. 31-17.] Thus, even if Hospitality were not obligated to pay

---

[7] Additionally, the record reflects that prior to October 2012, Insight notified Hospitality several times of the account delinquencies, and although not contractually required to do so, gave several warnings about the breach and attempted to resolve the problem by working out a payment schedule several months before threatening to suspend services. [R. 31-10; R. 31-11; R. 31-12.]

[8] These documents include the articles of organization as an LLC, letters to Mr. Prewitt from Hospitality advising him that Hospitality was planning to terminate their Management and Option Agreement because of Prewitt's

the Prewitt debt, Insight was well within its rights to suspend its services and could not have committed an anticipatory breach of the 2011 contract.

**3**

Plaintiffs' third claim is that the alleged verbal promise made by Reynolds constituted fraud, and on that basis, Plaintiffs seek a release of Hospitality, Host, and Holiday from all the 2011 Service Agreements. [R. 1-2 at ¶¶ 29-37.] Plaintiffs contend that Abdoo would not have consented to the 2011 Service Agreements for any of the three hotels but for his reliance on Reynolds' alleged promise not to seek collection of the Prewitt debt. [*Id*.] Plaintiffs' claim fails, however, because they cannot establish the required elements of fraud listed above. *See Flegles, Inc.*, 289 S.W.3d at 549. First, Plaintiffs have not established that Insight actually made a material representation to Abdoo about foregoing collection on the Prewitt debt. As Abdoo admitted, Plaintiffs do not have any written evidence of this conversation, nor have they submitted any evidence that Reynolds knew this alleged promise was false or that he made it recklessly.[9] [R. 31-5 at 37-40.] The portions of Reynolds' deposition filed with the Court also do not show that Reynolds knowingly or recklessly making a false representation. Hospitality argues that Reynolds "knowingly misrepresented his ability and Insight's willingness to obtain the waiver of the Prewitt Unpaid Balance" [R. 34 at 18], yet this argument undermines Hospitality's other contention that it was not legally responsible for Prewitt's debt – i.e., if

---

default on payments to Hospitality, and a letter to Mr. Prewitt informing him that Hospitality would "resume operation" of the hotel on January 28, 2011. [R. 31-17.] Plaintiffs do not argue that any other documents were submitted to Insight besides these, and Plaintiffs do not explain how these documents support their contention that although Hospitality owned the hotel since 2007 it is not obligated to pay the debt to Insight incurred before January 28, 2011.

[9] The Court notes that Reynolds' testimony does, however, indicate that if Hospitality had provided a deed showing that they did not actually own the Best Western before 2011, Insight likely would not have sought to collect the debt from them. Neither party has submitted any such deed, and it appears undisputed that Hospitality owned the hotel between 2007 and 2011, as further evidenced by the Hotel Management and Option Agreement made between Hospitality and Prewitt. [*See* R. 31-14.]

Hospitality were not legally obligated to pay the debt, Abdoo would not reasonably believe such a waiver was necessary.

Perhaps even more importantly, Plaintiffs cannot establish the element of reasonable reliance on the alleged promise. The 2011 Service Agreements contained no mention of forgiving the Prewitt debt, but Abdoo admitted that when he reviewed these agreements he was not concerned that there was no mention of forgiving the outstanding balance incurred by Prewitt. [R. 31-5 at 37-38; R. 32-7 at 31-32.] Additionally, the 2011 Service Agreements contained a merger clause expressly stating that the written document "contains, and is intended as, a complete statement of all the terms and arrangements among the parties with respect to the matters provided for," and that it "supersedes any previous agreements. . . ." [R. 31-4 at ¶12(o).] It would thus be unreasonable for Abdoo to rely on a previous oral agreement as an inducement to signing a contract containing no reference to that arrangement. According to Mr. Abdoo, he has a college degree in public service administration with concentrations in business and accounting, he is a graduate of several hotel management programs, he has a Certified Hotel Administrator's degree, and he has owned and managed numerous hotels, franchises, and other properties throughout his life. [R. 32-7 at 9-13.] Mr. Abdoo is clearly a sophisticated party who is able to understand contractual arrangements, and "at some point," courts have an obligation to "apply the contractual arrangements of two sophisticated parties." *Papa John's Int'l, Inc. v. Dynamic Pizza, Inc*., 317 F.Supp.2d 740, 745 (W.D. Ky. 2004) (finding that even if oral misrepresentations induced defendants to sign the contract, the merger and integration clause in that contract prevented litigation concerning any prior oral understandings separate from the written agreement).

It would also be unreasonable to rely on an oral promise when, under Kentucky law, "a party may not rely on oral representations that conflict with written disclaimers to the contrary which the complaining party earlier specifically acknowledged in writing." *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636 (Ky. App. 2003). Additionally, for a misrepresentation to be the basis of a fraud claim, such that it can induce reasonable reliance, it cannot merely be a prediction, but must relate to an existing fact or a past fact. *Id.* at 262; *see also McHargue v. Fayette Coal & Feed Co.*, 283 S.W.2d 170, 172 (Ky. 1955); *Edward Brockhaus & Co. v. Gilson*, 92 S.W.2d 830, 834 (Ky. 1936). Plaintiffs have not demonstrated that Reynolds' alleged promise was anything other than an assurance about the future, rather than an existing fact, nor have they shown that it was reasonable to assume Reynolds was even able to perform the alleged promise and cause Insight to forgive the debt. A misrepresentation relating to "a future promise or an opinion of a future event" is not actionable under Kentucky law. *Radioshack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256, 262 (Ky. App. 2007) (finding alleged misrepresentations were not actionable because there can be no reasonable reliance on promises of future performance, particularly when a franchise agreement disclaimed any oral understandings not set out in the written contract).[10] Accordingly, Plaintiffs have not proved each element of their fraud claim by the "clear and convincing evidence" required to prevail on such a claim, *Yeager v. McLellan*, 177 S.W.3d 807, 809 (Ky. 2005), and which is particularly

---

[10] The Court further notes that part of Plaintiffs' argument concerning their fraud claim undermines their other argument that they were not obligated to pay the debt incurred during Prewitt's management. While Plaintiffs maintain that their inducement to sign the 2011 Service Agreements was the promise that Hospitality would not have to pay the Prewitt delinquency [R. 34 at 18], Plaintiffs do not explain why such a promise would induce Abdoo to sign a contract with Insight for all three hotels if Hospitality truly was not responsible for paying the debt.

necessary in the context of overcoming summary judgment.[11]  *See Liberty Lobby,* 477 U.S. at 253.

**4**

As for Count IV of Plaintiffs' amended complaint, while Kentucky law imposes an obligation of good faith and fair dealing in performing any contract, KRS § 355.1-203, "Kentucky law does not recognize an independent tort for breach of good faith and fair dealing outside of insurance contracts."  *Crestwood Farm Bloodstock, LLC v. Everest Stables, Inc.*, 864 F.Supp. 629, 634 (E.D. Ky. 2012); *see also Peacock v. Damon Corp.*, 458 F.Supp.2d 411, 419-20 (W.D. Ky. 2006).  Thus, Plaintiffs' allegation that Insight breached the duty of good faith and fair dealing is not an independent cause of action permitted by Kentucky law.[12]  Accordingly, summary judgment will be granted to Insight on all of Plaintiffs' claims.

**D**

**1**

Insight also moves for summary judgment in its favor on each of its counterclaims against Plaintiffs, and the Plaintiffs have filed a cross-motion for summary judgment in their favor concerning the first of those counterclaims.  In its first counterclaim, Insight alleges that Hospitality breached the 2001 SAI Standard Hotel Agreement by failing to pay Prewitt's unpaid balance of $8,626 for cable services provided by Insight to the Best Western hotel prior to January 28, 2011.  [R. 5 at 11.]  Insight also alleges that Insight has provided cable service to the Best Western hotel according to the SAI Agreement signed with SAI in 2001 during the entire

---

[11] The parties argue extensively about whether Hospitality waived any fraud claim by continuing to perform under the contract for several months, but the question of waiver is irrelevant because Hospitality cannot establish in the first instance the elements necessary to bring a fraud claim.

[12] Plaintiffs effectively concede as much in their response brief, but reserve the right to submit jury instructions concerning Insight's duties of good faith and fair dealing.  [R. 34 at 20.]

time Hospitality owned the hotel [R. 31-8 at ¶ 5], and that Hospitality is thus responsible for the unpaid balances on the charges incurred by Prewitt because Prewitt was acting as Hospitality's agent. [R. 31-1 at 24-25.] In response, Plaintiffs argue that 1) the SAI Agreement is unenforceable; 2) that it terminated in 2004 and is inapplicable to the time during which Hospitality owned the hotel; 3) and that even if the Agreement did not terminate, Hospitality should not be obligated to pay any debt incurred before January 28, 2011, because there was no assignment of the SAI contract to Hospitality and because Hospitality's 2011 contract with Insight extinguished any preexisting debt. [R. 32-1 at 4-10.]

These arguments involve a myriad of inter-related issues, and the Court will address them chronologically. The parties do not dispute that Hospitality did not own the Carrollton Best Western Hotel in 2001when SAI entered into the SAI Standard Hotel Agreement with Insight, nor do they dispute that Hospitality has been the owner of the hotel from 2007 until the present, or that Hospitality did not sign a contract with Insight until the 2011 Service Agreements. Thus, even before addressing whether Hospitality is obligated to pay the debt incurred by Prewitt, the first issue to resolve is whether Hospitality was bound by the SAI contract from the time it bought the hotel in 2007 until it signed the new contract with Insight in March 2011. As explained below, the answer is yes."

Hospitality first argues that the 2001 agreement is unenforceable against anyone because no one from Insight signed it. [R. 32-1 at 5.] Although Hospitality does not mention the statute of frauds, which it presumably invokes by such an argument, Kentucky's statute of frauds only requires a signature from the "party to be charged" with performance of certain kinds of contracts. KRS § 371.010. Moreover, an exception to the requirement of a signature, which Plaintiffs acknowledge [R. 32-1 at 6], exists when one party signs but both parties still act as if

bound by the written agreement. *Cowden Mfg. Co. v. Sys. Equip. Lessors, Inc.*, 608 S.W.2d 58,

61 (Ky. App. 1980). Here, Insight has clearly presented evidence of a course of dealing between

Insight and SAI Hospitality, and between Insight and all subsequent owners of the hotel, over a

period of several years whereby Insight provided continuous cable service in exchange for

payment pursuant to the 2001 SAI Agreement. Therefore the exception to the statute of frauds

would apply here because all involved parties have acted as if they were bound by 2001 SAI

Agreement despite the lack of a signature.

Hospitality next argues that because SAI was administratively dissolved in 2002, the SAI

Agreement must have lapsed, or that the agreement at least terminated in 2004 because it was for

a three-year term and subsequent parties owned the hotel but did not renew the contract. [R. 32-

1 at 6.] This argument requires analysis of the contract itself. The SAI Agreement stated that

"[u]nless otherwise terminated in accordance with the terms hereof, this Agreement shall be for

an initial term of three (3) years" with an automatic renewal "for like periods of one (1) year

each unless either party notifies the other in writing otherwise." [R. 31-13 at ¶4.] The

Agreement further provides that the contract and its obligations "shall be binding upon and inure

to the benefit of the parties hereto and their respective successors and assigns." [R. 31-13 at ¶

12(b).] In the event of a sale of the hotel, the owner is supposed to give notice of the Agreement

to any prospective purchaser, but there is no requirement that notice of a sale be given to Insight.

[*Id*.] Thus, it would appear from such language that the contract actually contemplates the

possible sale of the hotel, but does not assume that selling the hotel would make the Agreement

automatically lapse or otherwise terminate.

Elsewhere, the SAI Agreement provides two ways by which the contract could be

terminated: 1) material breach by either party after 30 days written notice, or 2) by Insight if

Insight is unable to continue distribution of its service and provides 60 days prior written notice. [R. 31-13 at ¶13.] Clearly, the only listed means of termination do not include or mention sale of the hotel to another party, and thus, sale of the hotel, even without notice to Insight of such a sale, was not an event that could terminate the contract. The dissolution of the company owning the hotel is also not one of the events that could result in termination of the contract. Accordingly, when reading the language of the contract in context, the fact that SAI dissolved, or sold the hotel, or was taken over by some other entity would not result in termination of the contract with Insight. Rather, the successors to SAI would still be bound by that same contract.

Moreover, Plaintiffs have not produced any evidence showing that the SAI Agreement was ever terminated by one of the two specified methods of termination. Plaintiffs also have not shown, or even alleged, that SAI or any of its successors ever attempted to terminate the contract. On the other hand, Insight has produced substantial evidence that Insight continued to provide services as if bound by the contract, and continued to receive payments pursuant to the contract from SAI's successors, with the exception of the missed payments during the time Prewitt managed the hotel.[13]

Having found that the 2001 SAI contract was valid, enforceable, and did not lapse or terminate before 2011, the next related question concerns Hospitality's arguments that it was not bound by the SAI contract because it did not purchase the hotel from SAI nor did it assent to an assignment of the contract. [*See* R. 32-1 at 7-8.] The parties do not dispute that after SAI Hospitality dissolved, NC Capital bought the hotel, and Hospitality then bought the hotel from NC Capital in 2007. [R. 31-5 at 16-18.] As stated above, the language of the SAI Agreement does not stipulate that a new contract would have to be negotiated each time ownership of the

---

[13] Although the Court finds that the SAI contract did not lapse or terminate according to its terms, even if there were still some question about its possible lapse, a contract may also be implied in fact when the parties' course of dealing show a mutual intent to contract, as they do here. *See Rider v. Combs*, 256 S.W.2d 749 (Ky. 1953).

hotel changed hands. On the contrary, the contract clearly contemplated the eventual sale of the

hotel, and stated that the Agreement would continue to be binding on SAI's successors. Apart

from breach or Insight's inability to provide services, the contract was automatically renewed

year after year, regardless of ownership. Hospitality does not present any legal argument or

evidence showing why Hospitality would not be considered a successor to the SAI contract.

The general rule under Kentucky law on successor liability is that "a purchaser, in the

absence of a contract obligation, cannot be held for the debts and liabilities of the selling

corporation." *Am. Ry. Express Co. v. Commonwealth*, 228 S.W. 433, 441 (Ky. 1920); *see also*

*Pearson ex rel. Trent v. Nat'l Feeding Sys*., 90 S.W. 3d 46, 49. However, certain exceptions to

this rule exist, including 1) where the buyer expressly or impliedly agrees to assume the seller's

debts or other liabilities; 2) where the transaction involves a consolidation or merger; 3) where

the transaction amounts to "a mere reincorporation or reorganization of the selling corporation"

and the buyer merely operates as a continuation of the seller; or 4) where the transaction is

entered into fraudulently in order to escape liability for the seller's debts. *Conn v. Fales Div. of*

*Mathewson Corp*., 835 F.2d 145, 146 (6th Cir. 1987) (citing *Am. Ry. Express Co.*, 228 S.W. at

437); *Pearson ex rel. Trent*, 90 S.W. 3d at 49.

Here, Insight asserts that the first and third exceptions listed above apply to when

Hospitality originally bought the hotel, and when Hospitality resumed management of the hotel

from Prewitt. [R. 36 at 13; R. 39 at 11.] As previously discussed, Hospitality impliedly assumed

SAI and NC Capital's contractual obligations to pay Insight for its services by continuing to

accept such services from Insight and pay for them according to the terms of the 2001 SAI

contract. *See Conn*, 835 F.2d at 146. Moreover, the third exception may also apply. There are

several elements courts look at in determining whether to apply the "mere continuation"

exception, including but not limited to the continuity of business operations and practices; the continuity of managers, employees, physical location, and products; the transfer of the same business assets; and whether the successor holds itself out to the public as a continuation of the previous company. *See Conn*, 835 F.2d at 147; *United States v. Distler*, 741 F.Supp. 637, 642-43 (W.D. Ky. 1990), *declined to follow on other grounds, City Mgmt. Corp. v. United States Chem. Co.*, 43 F.3d 244, 252 n. 12 (6th Cir. 1994); *Pearson*, 90 S.W.3d at 51; *Am. Ry. Express Co.*, 228 S.W. at 441. The parties have not engaged in argument concerning the application of these elements, and Plaintiffs have not disputed that the "mere continuation" exception applies. From the evidence before the Court, it appears that regardless of the hotel's actual owners or managers, the hotel continued to be operated as the Carrollton Best Western hotel offering essentially the same services, having the same name, and holding itself out to the public as the same entity during the entire time period from 2001 until the present. No evidence contradicting these conclusions has been submitted to the Court, and thus both the "mere continuation" exception and the implied agreement exception apply to this situation as a legal basis for determining that Hospitality succeeded to the contractual obligation to pay Insight for cable services.

Even if Hospitality did not assume the SAI Agreement, a contract may be implied in fact when the parties' course of dealing show a mutual intent to contract. *Rider v. Combs*, 256 S.W.2d 749, 749 (Ky. 1953). Additionally, a contract can be implied in law even in the absence of any agreement between the parties "where the law of natural justice says there should be a recovery." *Perkins v. Daugherty*, 722 S.W.2d 907, 909 (Ky. App. 1987). A contract implied in law "allows for recovery under the theory of *quantum meruit* for the unjust enrichment of another." *Zoechem, LLC v. Sud-Chemie, Inc.*, 2010 WL 2696470, at *4 (Ky. App. July 9, 2010). Here, regardless of the SAI Agreement, Insight continued to provide cable services, and

Hospitality was the entity who continued to pay for those services for nearly two years *before* Hospitality allowed Prewitt to manage the hotel. None of the parties have argued that there were problems in this arrangement before 2012, and to now argue that Hospitality was unaware of any contractual obligation to Insight before 2011 is implausible at best. At the very least, Hospitality and Insight had an implied contract, by which Insight's continued performance of providing cable services obligated Hospitality to pay for them during the time that Hospitality owned the hotel. *See Corbin's Ex'rs v. Corbin*, 194 S.W.2d 65, 68 (Ky. 1946) (holding that "where one performs labor or renders services for another with his assent and under circumstances which ordinarily call for payment, there is a presumption that the one benefited intended payment"); *Batts v. Snook*, 105 S.W.2d 843, 846 (Ky. 1937) (finding that an implied contract to pay for services can arise when the services were performed "under such circumstances as to give the recipient thereof some reason to think they are not gratuitous, nor performed for some other person, but with the expectation of compensation from the recipient"); *see also Associated Warehousing, Inc. v. Banterra Corp.,* 491 Fed. Appx. 516, 519 (6th Cir.2012) (citing *Talamini v. Rosa,* 77 S.W.2d 627, 630 (Ky. 1934) (finding that "the equitable doctrine of part performance can render an otherwise unenforceable agreement binding on both parties" by entire or partial performance)). Thus, even if there had never been a contract with SAI, Insight performed services with an expectation of payment during the time Hospitality owned the hotel, and the course of dealing between the parties would obligate Hospitality to pay for the services it accepted from Insight on a continual basis for several years without complaint.

Plaintiffs also refer to *Johnson v. Coleman,* Ky., 288 S.W.2d 348, 349 (1956), to argue that "the obligations of a contract are limited to the parties thereto and cannot be imposed on a stranger to the contract, particularly when the contract is one for services." *Kovacs v. Freeman*,

957 S.W.2d 251, 256 (Ky. 1997) (citing *Johnson v. Coleman,* Ky., 288 S.W.2d 348, 349 (1956)).

In *Johnson*, however, one party attempted to enforce a contract against a party with whom there

was no privity of contract, particularly because there was nothing that led the court to believe

that any of the parties had assumed the contract's terms. *Johnson*, 288 S.W.2d at 349. Here,

however, Plaintiffs have offered no evidence to show that they were not successors to the

contract. On the contrary, Hospitality received services from Insight for over four years, and for

the nearly two years of time before Prewitt was managing the hotel, Hospitality paid Insight for

those services. Such actions would indicate an implied contract existed at the very least, if not a

knowing assumption of the SAI contract.

 Finally, Hospitality argues that any outstanding debt owed to Insight before 2011 was

extinguished by the merger clause in the 2011 Service Agreement because of the Agreement's

statement that it "supersedes any previous agreements, including the Standard Hotel Agreement

between Insight and SAI Hospitality, LLC dated July 1, 2001." [R. 32-1 at 9 (quoting R. 31-4 at

§12(o).] This argument, however, reflects a misunderstanding of how merger clauses operate. A

merger or integration clause is a contractual provision that "operates to prevent a party from

disavowing the written contract by claiming that the true agreement between the parties included

other, *unwritten* terms or conditions." *Energy Home, Div. of S. Energy Homes, Inc. v. Peay*, 406

S.W.3d 828, 834 (Ky. 2013) (quoting 17A C.J.S. *Contracts* § 577 (2013) (emphasis added)). In

general, a merger clause will operate to preclude evidence offered "for the purpose of varying or

contradicting the writing." *KFC Corp. v. Darsam Corp*., 543 F. Supp. 222, 225 (W.D. Ky.

1982). Here, the 2001 SAI Standard Hotel Agreement between Insight and SAI is not unwritten

parol evidence, nor is it offered for the purpose of varying any term in the 2011 Service

Agreements. The SAI Agreement is a separate *written* contract obligating SAI and its successors

to pay Insight for their services. While it is true that the 2011 Service Agreement constituted a new contract between Hospitality and Insight to govern their relationship from 2011 onward, it would be illogical to assume that the merger clause meant that Hospitality should benefit from free cable services before 2011 or that no one was obligated to pay Insight the debt that had been previously incurred under a separate contract.[14]

Thus, under the plain language of the SAI Standard Agreement, and in the absence of any evidence to the contrary, it is clear that the SAI contract did not terminate prior to 2011; that as a successor to the SAI contract Hospitality was obligated to pay Insight for the services provided to it under that contract; and that the merger clause in the 2011 contract does not extinguish Hospitality's obligations to pay for services received before executing the 2011 contract. The remaining issue, and perhaps the most pertinent question, is whether Hospitality was obligated to pay for debts incurred during the time Prewitt managed the hotel. Insight argues that Hospitality must pay the unpaid balance incurred by Prewitt because Prewitt was acting as Hospitality's agent during the time the debt was incurred. [R. 31-1 at 24-25.] Hospitality does not address the application of agency law to its relationship with Prewitt, nor does Hospitality present any caselaw or other evidence establishing that Prewitt was not Hospitality's agent. Rather, Hospitality primarily contends that Prewitt assumed the responsibility for all operational expenses including contracts for cable services under the contract Prewitt signed with Hospitality. [R. 34 at 9.] Amidst the myriad of convoluted arguments presented by the parties on this issue, it is important to remain focused on the salient facts. The parties do not dispute

---

[14] In support of this argument, Hospitality cites to caselaw discussing how a merger clause in a franchise agreement barred the introduction of parol evidence of other prior agreements. [R. 34 at 7 (citing *KFC Corp. v. Darsam Corp.*, 543 F. Supp. 222, 225 (W.D. Ky. 1982).] Such caselaw, however, contradicts Hospitality's other arguments concerning Reynolds' alleged misrepresentations. Plaintiffs cannot simultaneously argue that the same merger clause should not bar parol evidence of conversations between Reynolds and Abdoo, but should instead bar consideration of previous written contracts. Plaintiffs cannot have it both ways.

that Insight provided cable services to a hotel owned by Hospitality and managed by Prewitt for a significant period of time, during which certain bills owed to Insight were not paid. Clearly, someone owes Insight money for those services, and the crucial question is whether an agency relationship existed such that Hospitality can be held liable as a principal for a debt incurred by its agent.

Under Kentucky law, an agency relationship is formed by:

". . . [A] contract, either express or implied, by which one of the parties confides to the other the management of some business to be transacted in his name, or on his account, by which the other assumes to do the business, and to render an account of it. The agent is a substitute or representative of his principal and derives his authority from him.

*GGNSC Stanford, LLC v. Rowe*, 388 S.W.3d 117, 122 (Ky. Ct. App. 2012) (quoting other Kentucky cases); *see also Hatcher-Powers Shoe Co. v. Kirk*, 24 S.W.2d 903, 905 (Ky. 1930) ("An agent is one who acts for, or in the place of, another by authority from him, or who undertakes to transact some business or manage some affair for him. . ."). When the relationship between the principal and the agent is defined by a contract, as is the case here, "a limited agency relationship arises," in which "the existence and extent of the agent's duties are determined by the agreement between the parties." *Monumental Life Ins. Co. v. Nationwide Retirement Solutions, Inc*., 242 F.Supp.2d 438, 449 (W.D. Ky. 2003) (citations omitted.) When an agent is acting within the scope of the agency, as defined by the contract, the acts of the agent bind the principal. *Kentucky Home Life Ins. Co. v. Johnson*, 93 S.W.2d 863, 867 (Ky. 1936). "The principal is bound by the contract of his agent when at the time it was made the agent acted within the limits of his express authority, or the scope of his implied authority." *Hatcher-Powers Shoe Co*., 24 S.W.2d at 905. In legal terms, when a principal acts through an agent, "he is himself acting and thus is responsible for acts of his agent. Therefore when an agent fails in any

duty which he owes to a third party or to the public generally, the principal is responsible for the failure." *Smith v. Smith*, 333 S.W.2d 503, 504 (Ky. 1960).

Here, the Hotel Management and Option Agreement clearly establishes an agency relationship between Hospitality and Prewitt Holdings, LLC. [R. 31-14.] That agreement states that part of the purpose of the arrangement was for the Operator (Prewitt) "to provide Owner with the benefits of its management." [R. 31-14 at 1.] The agreement defines the relationship between the parties as one in which the Operator would act "for and on behalf of Owner, in the name of Owner, and for Owner's account and expense." [*Id*. at ¶ 2.1.] In any actions the Operator took pursuant to the agreement, "Operator will be acting only as agent for Owner and nothing herein shall constitute or be construed to be or create a partnership, joint venture, or any other relationship." [*Id*.] Prewitt was to operate and manage the hotel for the benefit of Hospitality, and transact business on Hospitality's behalf. Such an arrangement is a quintessential agency relationship in which the scope of the agency is defined by contract. The scope of the agency, and thus the actual authority delegated to Prewitt, included the authority to "[n]egotiate and enter into service contracts necessary or desirable in the ordinary course of business in operating the Hotel. . . ." [*Id*. at ¶ 5.1(E).]

Hospitality correctly states that the contract specified that Prewitt would "be responsible for all fees and expenses necessary for the operation of the Hotel, . . . including without limitation all fees under service contracts. . . ." [*Id*. at ¶ 5.1.] That clause, however, defines the actual authority Prewitt had, and does not act to limit Hospitality's liability for the contracts Prewitt entered into pursuant to that authority. Actual authority given to an agent defines the limits of the agent's authority, but defining such limits does not simultaneously eliminate the principal's own liability for the contract its agent enters into when acting within the bounds of

that authority. *See Hatcher-Powers Shoe Co*., 24 S.W.2d at 905. Thus, Prewitt had the actual authority to enter into service contracts such as the one with Insight, and to incur bills for those services; but such a delegation of authority does not eliminate Hospitality's legal obligations as the principal. *See id*. The contract language defining Prewitt's responsibility may indicate that Hospitality has a cause of action against Prewitt to obtain reimbursement from Prewitt for any bill not paid while Prewitt was managing the hotel,[15] but that does not mean that Insight does not have an equally valid cause of action against Hospitality as the principal. *See Smith*, 333 S.W.2d at 504.

## 2

Insight's second counterclaim alleges that Hospitality breached the 2011 Standard Hotel Agreement by failing to pay for services provided by Insight under that agreement. [R. 5 at ¶¶ 23-24.] The parties do not dispute the existence of the 2011 Service Contract between Insight and Hospitality. Pursuant to that contract, Hospitality agreed to pay Insight in advance for all recurring monthly services provided by Insight, and Insight reserved the right to terminate services if the customer's account "remains outstanding for greater than thirty (30) days." [R. 31-4 at ¶3(b); *see also* R. 31-3 at ¶1.] As previously discussed, Insight has submitted evidence that shortly after signing this agreement in 2011, and *after* Hospitality had resumed management of the hotel from Prewitt, Hospitality consistently carried a large overdue balance for Insight's services resulting in an account balance of $18,321.92 by May 2012. [R. 31-9.] Hospitality further breached the contract by obtaining a new contract with a different service provider before the contract with Insight had been officially terminated, an action which the agreement

---

[15] *See, e.g*., R. 31-14 at ¶10.2, stating that Prewitt agreed to indemnify the Owner for the cost of claims, liabilities, and other expenses sustained as a result of any omission or breach on the part of Prewitt.

specifically prohibited. [R. 31-12.] Insight has established that it sustained damages in the amount of the bills that Hospitality did not pay.

Hospitality's only response to this evidence is its contention that Insight first breached the agreement by threatening to suspend services if Hospitality did not pay the debt owed by Prewitt. [R. 34 at 9.] As explained above, Hospitality is obligated to pay the debt incurred by its agent Prewitt, and even if Hospitality were not obligated to do so, Insight still was within its contractual rights to suspend services. Accordingly, the Court will grant summary judgment to Insight on its second counterclaim.

**3**

Insight's remaining counterclaims seek a declaratory judgment that the 2011 Service Agreements are valid and enforceable, and that Hospitality, Host, and Holiday are each bound by those agreements.[16] [R. 31-1 at 29-31.] "[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995). In determining whether to grant declaratory judgment, courts within the Sixth Circuit look to the following five factors:

> (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;" (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

---

[16] Fed. R. Civ. P. 57 makes the Federal Rules of Civil Procedure, including Fed. R. Civ. P. 56(a), generally applicable to actions for declaratory judgment.

*Grand Trunk W. R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984); *see also*

*Scotsdale Ins. Co. v. Flowers*, 513 F.3d 546, 554 (6th Cir. 2008) (quoting *Grand Trunk W. R.*

*Co.*, 746 F.2d at 326).

Here, Plaintiffs present no evidence as to why a declaratory judgment would not be

appropriate in this case, and make no arguments based on the factors the Court must consider.

Moreover, the parties do not dispute the existence of the 2011 Service Agreements between

Insight and Hospitality, Host, and Holiday, and the only dispute concerning their validity is

Plaintiffs' contention that Insight fraudulently induced Abdoo to enter into these agreements.  [R.

34 at 10-11.]  As explained above, Plaintiffs cannot establish a valid fraud claim, and they offer

nothing else that would cause the Court to question the validity or the enforceability of these

contracts.  Thus, a declaratory judgment would likely settle the current controversy and would be

useful in clarifying the legal relations of all the parties involved.  *See Grand Trunk W. R. Co.*,

746 F.2d at 326.

Moreover, it does not appear that the requested judgment was proposed to gain a

procedural advantage since it was filed in response to Plaintiffs' complaint.  As for the fourth

factor, the Court has already determined it has diversity jurisdiction, and there is no related case

pending in state court.  Lastly, the parties have not suggested a better alternative remedy, nor

does the Court see a more effective remedy than to clarify the parties' contractual relations and

thereby likely prevent further litigation over each of the 2011 Service Agreements.  For all the

reasons explained above, declaratory judgment would be appropriate in this case.

**4**

Finally, Insight requests its reasonable attorneys' fees and costs incurred in connection

with this action, pursuant to the contracts between the parties.  [R. 5 at 14.]  Although the general

"American Rule" requires each party to bear its own attorney fees, several exceptions to the rule exist, such as when a private contract contains a fee-shifting provision. *See Aetna Casualty & Surety Co. v. Commonwealth of Kentucky,* 179 S.W.3d 830, 842 (Ky. 2005); *Hodak v. Madison Capital Management, LLC*, 2011 WL 6026705, at *2 (E.D. Ky. Dec. 5, 2011). Contractual fee-shifting provisions are enforceable under Kentucky contract law, and are an appropriate basis for awarding attorneys' fees in this court as well. *See Hodak,* 2011 WL 6026705, at *2 (citing *Nelson Ins. Agency, Inc. v. Famex, Inc.*, 706 S.W.2d 838, 840 (Ky. Ct. App. 1986)).

As explained above, the 2011 Service Agreements between Insight and each of the Plaintiffs are valid, and the 2001 SAI Standard Agreement is also valid and enforceable against Hospitality prior to 2011. Each of those contracts contains an identical fee-shifting provision by which "the reasonable costs of the prevailing counsel's fee will be paid by the other party should any court determination be necessary to enforce this contract." [R. 31-13 at ¶12(g); R. 31-4 at ¶12(m); R. 31-6 at ¶12(m); R. 31-7 at ¶12(m).] According to its plain terms, that provision allows the prevailing party to recover its attorneys' fees if litigation becomes necessary to enforce the contract. Although Plaintiffs initiated the litigation, Plaintiffs seek to rescind the contracts rather than to enforce them, and so would not be entitled to recover their attorneys' fees. Because the Court is granting summary judgment to Insight, Insight is the prevailing party and may recover its reasonable fees and costs associated with this litigation.

## E

Although Insight is the prevailing party in this litigation, there remains a genuine dispute as to the amount of damages that Insight claims it is entitled to recover. Insight's proposed order requests $75,633.87 in damages. [R. 31-18 at ¶3.] Plaintiffs contest that amount does not appropriately itemize the damages nor identify the process used to calculate the damages, and

that the amount requested includes claims on other contracts between Insight and Hospitality that are not included in this litigation. [R. 34 at 12.] Insight concedes that the initial amount of damages requested is too high because the amount included damages for claims that Insight has not pled in its counterclaims. [R. 39 at 14.] Insight has submitted a supplemental declaration and payment ledger, which it asserts represents the correct amount of $60,034.56 in damages. [R. 39-1.] Despite Insight's supplemental filings, however, the Court agrees with Plaintiffs that questions of material fact remain as to how this amount was calculated, particularly concerning whether taxes are included and whether the debt owed by Prewitt is included in the final amount. [*See* R. 41-1 at 3.]

Additionally, the Court finds that a genuine issue of fact remains concerning Plaintiffs' allegations that Insight failed to mitigate its damages with regard to the debt incurred by Prewitt. Plaintiffs point to a ledger submitted by Insight showing that Prewitt only made one payment to Insight in a ten-month period of time [R. 34-4], and Insight acknowledges that the Best Western's account during Prewitt's management carried an unpaid balance for a significant period of time. Plaintiffs contest that because Insight's standard hotel contract gives it the right to suspend service whenever a customer has an outstanding bill for more than thirty days, and because Insight allowed Prewitt to incur an arrearage of $8,626 without suspending service, Insight thus "failed to take any reasonable steps to mitigate its damages." [R. 41-1 at 3-4 (quoting *Fifth Third Bank v. Waxman*, 726 F.Supp.2d 742, 751 (E.D. Ky. 2010)).]

Plaintiffs are correct that Kentucky law requires non-breaching parties to make reasonable efforts to mitigate their damages. *Fifth Third Bank*, 726 F.Supp.2d at 751 (citing *Smith v. Ward*, 256 S.W.2d 385, 388 (Ky. 1953)); *Davis v. Fischer Single Family Homes, Ltd.*, 231 S.W.3d 767, 780 (Ky. Ct. App. 2007). The Court also notes that the "duty to mitigate is not

absolute," and "recovery is diminished only to the extent that the plaintiff fails to mitigate the damages as they would be mitigated by an ordinary, reasonable person under similar circumstances." *Morgan v. Scott*, 291 S.W.3d 622, 641 n. 49 (Ky. 2009). However, the contract clearly permitted Insight to take a number of steps in response to Prewitt's failure to make payments, and under the facts presented, a jury could reasonably find that Insight's failure to take those steps may constitute a failure to mitigate its damages. Thus far, Insight has not offered any evidence showing that it took reasonable efforts to mitigate its damages, *see Fifth Third Bank*, 726 F.Supp.2d at 751, and the Court finds that this failure, in conjunction with the questions surrounding Insight's calculations of its damages, create a genuine issue of material fact. Accordingly, the Court will deny Insight's motion for summary judgment to the extent that it seeks damages in an amount that has not been sufficiently itemized, explained, or shown to have been mitigated.

## III

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. Defendant Insight's Motion for Summary Judgment [**R. 31**] is **GRANTED IN PART** and **DENIED IN PART**;

2. Defendant Insight's motion for summary judgment on all claims alleged against it by Plaintiffs is **GRANTED**, and all claims alleged in the Plaintiffs' Amended Complaint are **DISMISSED WITH PREJUDICE**;

3. Defendant Insight's motion for summary judgment on its Counterclaims against Plaintiffs is **GRANTED** as to Counts I, II, III, IV, V, VI, and VII, but is **DENIED WITHOUT PREJUDICE** as to the amount of damages;

4.     Judgment having been granted for Insight on its Counterclaims, and pursuant to

28 U.S.C. §2201(a) and Fed. R. Civ. P. 57, the following agreements are declared valid and

enforceable, and the provisions of these agreements are binding on the parties thereto:

(a)     Standard Hotel Agreement between Insight and Carrollton Hospitality, LLC, dated March 10, 2011 ("CHL Standard Hotel Agreement")

(b)     Standard Hotel Agreement between Insight and Carrollton Host Enterprises, LLC, dated March 10, 2011 ("CHE Standard Hotel Agreement")

(c)     Standard Hotel Agreement between Insight and Carrollton Holiday Inn Express, dated March 10, 2011 ("HHL Standard Hotel Agreement")

5.     Insight, as the prevailing party, is allowed its costs, pursuant to Fed. R. Civ. P.

54(d)(1), and is awarded its reasonable attorney fees from Hospitality, Host, and Holiday,

pursuant to each of the Standard Hotel Agreements at issue in this litigation;

6.      Plaintiffs' Motion for Partial Summary Judgment [**R. 32**] on Counts I, III, and IV

of Insight's Counterclaim is **DENIED**;

7.     Plaintiffs' Motion for Leave to File a Sur-Reply [**R. 41**] in opposition to Insight's

motion for summary judgment is **GRANTED**; and

8.     This matter will remain on the Court's active docket pending resolution of the

issue concerning damages, and thus the dates for the Final Pretrial Conference and the Jury Trial

will remain as scheduled.

This the 3rd day of June, 2014.

Signed By:

*Gregory F. Van Tatenhove*

**United States District Judge**